**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

ROXANNE ARTHUR,

            Plaintiff,

    vs.                                                  No. 13-CV-1173-MV-WPL

BLOOMFIELD SCHOOL DISTRICT,
*et al.*,

            Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Bloomfield School District and

Defendant Bloomfield School District Board of Education's (collectively, the "Governmental

Defendants") Motion and Memorandum for Summary Judgment [Doc. 101] and Defendant Rob

Ford's Motion and Memorandum in Support of Summary Judgment [Doc. 102].  The Court,

having considered the Motions, briefs, attached materials, relevant law, and being otherwise fully

informed, finds that the Defendants' Motions are well-taken and will be **GRANTED**.

## BACKGROUND

**I.     Racial Discrimination**

      For reasons that will become apparent below, the facts as described here are drawn from

the briefs submitted on the Governmental Defendants' Motion.  This case centers on allegations

of racial discrimination against Plaintiff, a "female of Navajo descent" who, during the relevant

period, was employed by the Bloomfield School District "as a Social Worker."  Governmental

Defendants' Statement of Undisputed Material Facts ("GDSUMF") ¶ 1.  Evidently, staff

members at the school where Arthur worked engaged in convivial, if inappropriate, socializing

among themselves, including an episode in which the Plaintiff placed "peanut butter on Mr.

Ford's car door handle as a practical joke" and another in which she used "a jack to lift a

teacher's car off the ground where it would not be drivable."  *Id.* ¶ 2.  Plaintiff admitted in her

deposition that the relevant parties viewed this as part of "a casual working relationship …

because we got along.  We all got along."  *Id.* ¶ 4 (internal quotation marks and modifications

omitted).  That is, irrespective of how this behavior may appear to an outsider, Arthur believed

that she "had a light-hearted relationship with others at the school, including school resource

officer Tina Adair and Principal Rob Ford, as the office had a joking atmosphere."  *Id.* ¶ 2.

However, on at least one occasion, Defendant Ford exceeded the boundaries even of this

relatively permissive environment.  Ford "encouraged a school resource officer, Tina Adair, who

was employed by the Bloomfield Police Department to send Plaintiff a text message" in which

she referred to Plaintiff as a "squaw."  *Id.* ¶ 5.  *See also* Doc. 110 at 3.  Plaintiff discussed this

incident with both Adair and Ford, conveying that she found the use of the racist and sexist

epithet unacceptable; "Ford took responsibility for the message and he told [Arthur] that he did

not mean to offend" her, that he respected her, and that he would refrain from similar conduct in

the future.  GDSUMF ¶¶ 6-7.  Arthur accepted Ford's apology and indicated that if his apology

was sincere, she considered the matter resolved.  *Id.* ¶ 8.  While it is unclear whether Ford again

applied the term "squaw" or some derivative thereof to Arthur, there is no suggestion whatsoever

that Ford "used the term to Plaintiff directly" at any point after the first incident.  *Id.*

The only other accusation regarding Ford's use of the word "squaw" or any other

pejorative language referring to Native Americans centers on a conversation between Arthur and

a co-worker in July 2011.  *Id.* ¶ 10.  This co-worker merely stated to Arthur that "Ford had

referred to Plaintiff as a 'squaw' in the coworker's presence," without any indication as to when

or in what context Ford made this comment. *Id. See also* Doc. 110 at 3 (adding that the co-worker stated that Ford called Arthur a "fat squaw"). Even ignoring the obvious hearsay issue with Arthur's proffered testimony, it is unclear, even construed in Plaintiff's favor, whether the co-worker's anecdote describes events that transpired before or after Ford apologized for the text message, or, indeed, if it refers to an instance in which Ford related that incident to a mutual co-worker and thus used the term in a quotative fashion, rather than as a separate disparaging remark. *See* GDSMUF ¶ 11; Doc. 110 at 3. In any case, at most this amounts to a total of two racially-hostile remarks directed toward Arthur or any ethnic group to which she belongs.

Plaintiff seeks to add a third episode. She states that when Ford announced the results of the students' mock presidential election over the school public address system, he declared that "Obama Bin Laden" had won the contest. Plaintiff's Additional Statement of Undisputed Material Facts ("PASUMF") ¶ a. No investigation or official response resulted from this remark. *Id.* ¶¶ a-c. While the Court is incredulous that this conflation of President Obama's name with that of Osama Bin Laden was an expression of racial, rather than political, animus, it will assume for the purposes of resolving this Motion that this constitutes Ford's third-racially charged statement over the course of Arthur's decade-long tenure with the District. *See* GDSMUF ¶ 1.

## II.    Retaliation

Eventually, in August of 2011, Plaintiff complained to "HR Director Debbie Serrano" about Ford's derogatory language. GDSUMF ¶ 12. "An investigation was conducted after Plaintiff complained" which overlapped with another, concurrent investigation into allegations that Ford had sexually harassed a different co-worker. *Id.* ¶¶ 13-14 (internal quotation marks omitted). Shortly thereafter, "[a]s a result of the complaints, but prior to the conclusion of the investigation, Mr. Ford resigned" from his position. *Id.* ¶ 16. In July 2011, Arthur also filed a

Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") regarding Ford's conduct; Plaintiff amended this Charge of Discrimination On October 3, 2011 to include allegations of constructive discharge and retaliation. *Id.* ¶¶ 19, 33.

Plaintiff alleges that as a consequence of filing this complaint with the EEOC, she suffered "retaliation, which caused a significant change in her job duties, to include [sic] being excluded from a Crisis Response Team Briefing" that she would have otherwise attended. PASUMF ¶ i. Similarly, Plaintiff states that her office was moved without notice, though there is some suggestion that this was either the result of an oversight or that Plaintiff had, in fact, been advised of the relocation in advance. *Id.* ¶ j. *See also* GDSUMF ¶ 26 ("Plaintiff claims that, later in the school year, her office was moved without her consent, though she admits that her principal had previously told her that it was being moved; that the offices of other employees were moved; and, after Plaintiff objected, that her office was moved back."); Doc. 110 at 4 (not contesting this fact).

To this list, Arthur seeks to add two additional sets of instances, although it is unclear to this Court how they are retaliatory. First, she states that that "another BSD employee spread[] rumors about her around town" and agitated for her termination, but that "then-Alta Mesa [sic] Principal Bill Noland" believed the matter was not being taken seriously by the Governmental Defendants. PASUMF ¶ k. Second, Arthur asserts that the "BSD administration [made] a point of stating she was not to be off the school site while at work, in spite of the fact that she had Noland's permission and was actually engaging in her role as a social working during times of extreme stress and grief for the students involved." *Id.* ¶ m. The Governmental Defendants "dispute[] that anyone from the main office inquired about Plaintiff's daily activities as the undisputed evidence shows that neither Ms. Serrano nor Mr. Rasor ever inquired about her

whereabouts" and note that "this asserted fact is also immaterial as it is uncontested that Plaintiff

was not disciplined and that she never complained to anyone about this issue."  Doc. 116 at 6.

## III.    Prior Proceedings

On December 10, 2013, Plaintiff filed a Complaint in this Court, alleging, *inter alia*,

racial discrimination, retaliation, and constructive discharge.  *See generally* Doc. 1.  Defendant

amended this Complaint on July 25, 2014.  *See generally* Doc. 62.  The Governmental

Defendants then moved this Court to dismiss some of Arthur's claims on August 8, 2014.  *See*

*generally* Doc. 72.  The Court partially granted the Motion, dismissing:  1) any standalone claim

for punitive damages, 2) any claims arising from the common law of New Mexico, 3) any

retaliation claim based on events that occurred more than 300 days before October 3, 2012.  *See*

Doc. 124 at 10.  This leaves only claims pursuant to Title VII for retaliation and discrimination,

including those under a theory of constructive discharge.

## DISCUSSION

### I.    Defendant Rob Ford

Defendant Ford's motion is easily resolved.  Plaintiff does not dispute that she "has not

alleged that Mr. Ford constitutes an 'employer' within the meaning of Title VII."  Ford

Statement of Undisputed Material Fact ¶ 1.  *See also* Doc. 108 at 2.  While Arthur argues that

"Ford was Plaintiff's supervisor in her position as Social Worker at Mesa Alta" and therefore

"falls under the group of individuals who can be named as individual defendants in a Title VII

action," this analysis misstates Tenth Circuit law.  Doc. 108 at 9.  It is now undisputed in this

Circuit that "[w]hile an individual employee who serves in a supervisory position and exercises

significant control over the plaintiff's hiring, firing or conditions of employment, may qualify as

an employer for Title VII purposes … a plaintiff can only sue that individual in his or her official

capacity." *Hunt v. Central Consol. School Dist.*, 951 F. Supp. 2d 1136, 1204 (D.N.M. 2013) (internal quotation marks omitted).  *See also Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1083 n.1 (10th Cir. 2007) ("Under long-standing circuit precedent, supervisors and other employees may not be held personally liable under Title VII.").

Hence, because no individual capacity claim may survive and because any official capacity claim is redundant, Ford is entitled to summary judgment.  *See, e.g.*, *Moore v. Tulsa*, -- F. Supp. 3d --, 2014 WL 5419317, at *9 (N.D. Okla. Oct. 22, 2014) ("As this Court has previously written, if a governmental entity is already a defendant in a lawsuit, then any official capacity claims against its employees are redundant and may be dismissed.") (internal quotation marks and modifications omitted); *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010) ("Suing individual defendants in their official capacities under § 1983, we've recognized, is essentially another way of pleading an action against the county or municipality they represent.").  Further, although Ford technically did not join the Governmental Defendants' Partial Motion to Dismiss, the Court notes that Ford "adopt[ed] by reference" their arguments and that the reasoning on which the Court relied applies equally to Ford.  Doc. 102 at 1.  Thus, the sole remaining issue in this case is whether the Governmental Defendants are entitled to summary judgment on their Title VII claims.

## II.    The Governmental Defendants

### a.   *Motion for Summary Judgment*

Federal Rule of Civil Procedure 56 directs the Court to enter summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In evaluating the remaining Motion before it, the Court will "consider all facts and evidence in the light most favorable to the part[y]

opposing summary judgment." *Ron Peterson Firearms, LLC v. Jones*, 760 F.3d 1147, 1154

(10th Cir. 2014). In judging whether a *genuine* issue of material fact exists, the Court asks "if

there is sufficient evidence on each side so that a rational trier of fact could resolve the issue

either way" and "if under the substantive law [the fact] is essential to the proper disposition of

the claim." *Varnell v. Dora Consol. School Dist.*, 756 F.3d 1208, 1212 (10th Cir. 2014) (internal

quotation marks omitted). Thus, "a mere factual dispute need not preclude summary judgment."

*Sapone v. Grand Targhee, Inc.*, 308 F.3d 1096, 1100 (10th Cir. 2002).

    b.  *Title VII Discrimination*

        Title VII of the Civil Rights Act of 1964 provides that no employer may "discriminate

against any individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's race, color, religion, sex, or national origin."

*Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012). For these purposes,

discrimination "includes an employee's claims of a hostile work environment based on race or

national origin discrimination." *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir.

2007). However, "Title VII does not establish a general civility code for the workplace.

Accordingly, the run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in

American workplaces is not the stuff of a Title VII hostile work environment claim." *Morris v.

City of Colo. Springs*, 666 F.3d 654, 663-64 (10th Cir. 2012) (internal quotes and citations

omitted).

        Helpfully, the Tenth Circuit has explained that:

> To survive summary judgment on a claim alleging a racially hostile work environment, the plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive

working environment, and that the victim was targeted for harassment because of ... race or national origin.

*Al-Kazaz v. Unitherm Food Sys., Inc.*, 594 F. App'x. 460, 462 (10th Cir. 2014) (quoting *Hernandez*, 684 F.3d at 957).  Inherent in this evaluation is a recognition that "the environment must be both subjectively and objectively hostile or abusive."  *MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005).

"A hostile-environment constructive discharge claim entails something more:  A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign."  *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004).  That is, constructive discharge is, in effect, a work environment so hostile that it forces an employee to quit, which constitutes an adverse employment action.  *See Gerald v. Locksley*, 785 F. Supp. 2d 1074, 1119 (D.NM. 2011) ("A hostile work environment can become so severe that it gives rise to a constructive discharge, which is an adverse employment action.") (internal quotation marks omitted).  *See also Sandoval v. City of Boulder, Colo.*, 388 F.3d 1312, 1325 (10th Cir. 2004) ("Constructive discharge occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign.  Essentially, a plaintiff must show that she had no other choice but to quit.") (internal quotation marks omitted).

No such conduct has occurred in the instant case.  Construed in the light most favorable to the Plaintiff, the facts reveal at most two instances in which anyone employed by the Governmental Defendants engaged in racially-disparaging behavior toward her and a third occasion on which Ford made a comment that *might* be interpreted as a racist joke about President Obama.  Although Plaintiff alludes in her argument to a "pattern of racial slurs which Defendant Ford exhibited toward many minority groups during his term of employment," she has

adduced no facts to sustain such a finding other than the three isolated incidents described above. *See* Doc. 110 at 9.  Plainly, this is not the cloth from which a hostile work environment claim may be stitched.

First, the frequency of the racist statements falls well below the threshold required to survive summary judgment.  The Court is guided by the Tenth Circuit decision in *Chavez v. New Mexico*.  There, the panel explained that the "two comments fall far short of the 'steady barrage' required for a hostile environment claim" and that while it did "not condone" the conduct, it was not "pervasive or severe enough" to constitute discrimination actionable under Title VII.  *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005).  *See also Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) (explaining that a "plaintiff must show more than a few isolated incidents of racial enmity" to survive summary judgment on a Title VII claim) (internal quotation marks omitted); *Truman v. Brannan Sand & Gravel Co.*, No. 10–cv–00801–PAB–KLM,  2011 WL 5865047, at *9 (D. Colo. Nov. 22, 2011) (four uses of racial slurs insufficient to survive summary judgment).  Similarly, here, the three remarks at issue do not constitute the "steady barrage" required by the Tenth Circuit; while Ford's behavior may have been unpleasant, the facts before the Court do not describe conduct sufficiently pervasive to sustain a Title VII claim.

Second, although the Court finds any racial animus profoundly abhorrent, the comments at issue here are not sufficiently severe, in light of their relative infrequency, to substantiate a hostile work environment claim.  *See Tademy v. Union Pacific Corp.*, 614 F.3d 1132, 1114 (10th Cir. 2008) ("We may consider the conduct's frequency and severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the plaintiff employee's work performance.") (internal quotation marks omitted).  Here, Ford's comments, while undoubtedly churlish and inappropriate, fall into the relatively broad

realm of merely offensive workplace friction not cognizable in Title VII suits.  *See, e.g.*, *McElroy v. American Family Ins. Co.*, 51 F. Supp. 3d 1093, 1111 (D. Utah 2014) ("In evaluating a hostile work environment claim, the Court considers the work atmosphere both objectively and subjectively while keeping in mind that Title VII is not a general civility code for the American workplace.  To that end, run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim.") (internal quotation marks omitted).  A few scattered racial epithets, without any suggestion of genuine hostility, threatening conduct, or humiliation, while deeply regrettable, are not cognizable in a hostile work environment suit brought pursuant to Title VII.

Third, "the comments were made jokingly," and Ford apologized immediately after Arthur confronted him about the matter, both of which are features generally antithetical to a timbre of acrimony or enmity that might alter the conditions of employment.  *Nettle v. Cent. Okla. Am. Indian Health Council, Inc.*, 334 F. App'x. 914, 924 (10th Cir. 2009).  The Court repeats that it finds Ford's comments offensive, but in light of their infrequency, the undisputedly "light-hearted relationship" between Arthur and Ford, the "joking atmosphere" that prevailed in the workplace, and the fact that Ford apologized sincerely for his remarks, the three statements at issue here are insufficient to survive summary judgment.  *See* GDSUMF ¶¶ 2, 7-8.

Even viewed in the light most favorable to Arthur, the undisputed facts in this case cannot make out a hostile work environment claim under Title VII of the Civil Rights Act of 1964.  It follows then, *a fortiori*, that Arthur cannot recover under a constructive discharge theory, as this would require "something more."  Consequently, the Governmental Defendants are entitled to summary judgment on Plaintiff's Title VII discrimination claim.

c.  *Title VII Retaliation*

Although Arthur cannot sustain a claim for racial discrimination, she may still pursue her

claim for retaliatory discharge.  "To prevail on a Title VII retaliation claim, a plaintiff must

establish that retaliation played a part in the employment decision."  *Fye v. Okla. Corp. Comm'n*,

516 F.3d 1217, 1224 (10th Cir. 2008).  Arthur can meet this burden "in one of two ways."  *Estate*

*of Bassatt v. Sch. Dist. No. 1 in the City and Cnty. of Denver*, 775 F.3d 1233, 1238 (10th Cir.

2014).  If such evidence exists, Arthur "may directly show that 'retaliatory animus' played a

motivating role in the employment decision."  *Id.*

Alternatively, "she may instead rely on the three-part *McDonnell Douglas* burden-

shifting approach to show that the employer's proffered reason for [the employment decision]

was merely a pretext."  *Id.*  This analysis requires a plaintiff to "show that (1) that he engaged in

protected opposition to discrimination, (2) that a reasonable employee would have found the

challenged action materially adverse, and (3) that a causal connection existed between the

protected activity and the materially adverse action."  *Somoza v. Univ. of Denver*, 513 F.3d 1206,

1212 (10th Cir. 2008).  For these purposes, an "action is materially adverse if it well might have

dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Green v.*

*Donahoe*, 760 F.3d 1135, 1146 (10th Cir. 2014) (internal quotation marks omitted).  "If the

prima facie case is made, the burden shifts to the employer to respond with legitimate,

nonretaliatory reasons for its actions."  *Id* (internal quotation marks omitted).  Here, because

Plaintiff has provided no direct evidence of retaliatory animus, the Court will turn to the

*McDonnell-Douglas* test.  *Cf. Bertsch v. Overstock.com*, 684 F.3d 1023, 1028 (10th Cir. 2012)

("Rarely will a plaintiff have direct evidence of a retaliatory motive; most plaintiffs attempt an

'indirect,' burden-shifting case.").

It is conceded for the purposes of this Motion that Plaintiff engaged in protected conduct by filing the Charge of Discrimination with the EEOC; therefore, the Court will turn to the two sets of retaliatory conduct that Arthur argues in her brief.  *See* Doc. 101 at 15.  First, Plaintiff alleges that she "did suffer adverse employment actions, to include [sic] being excluded from certain students' education plans," on three or four occasions and "at least once Crisis Response Team debriefing, an activity in which she had always taken part" prior to filing a complaint with the EEOC.  Doc. 110 at 11.  *See also* Doc. 116 at 4-5.  Exclusion from approximately five meetings is simply not "materially adverse" enough to qualify as retaliation.  *See, e.g.*, *Daniels v. United Parcel Service, Inc.*, 701 F.3d 620, 640 (10th Cir. 2012) (plaintiff "did not make out a prima facie case of retaliation because she did not establish that [her manager's] decrease in communications rose above the level of a mere slight or snub."); *Steele v. Kroenke Sports Enterprises, L.L.C.*, 264 F. App'x 735, 746 (10th Cir. 2008) ("Ms. Steele complains that Mr. Ackerman snubbed her and used Mr. Brockmeier as an intermediary after she told him that he made her sick.  This sort of personality conflict did not constitute a materially adverse action.  Nor was his alleged instruction to her co-employee not to join her on smoking breaks more than a nonactionable petty slight.") (internal quotation marks and citations omitted).  Additionally, any action taken while Ford was employed by the Governmental Defendants, even if retaliatory, is time-barred, as it necessarily occurred more than 300 days prior to October 3, 2012.  *See* Doc. 124 at 8-9.  This evidently excludes each of the meetings other than the Crisis Response meeting, further buttressing the Court's conclusion.  *See* Doc. 116 at 4-5 (citing to deposition testimony that indicates Ford excluded Arthur from the three or four meetings).

Second, Arthur contends that it was retaliatory for her employer to "mak[e] a point of Plaintiff's leaving the school grounds during the day as being an act outside of her job and one

which she was subject to discipline for." Doc. 110 at 11.  Even assuming that all of this, in fact, occurred, such increased scrutiny is flatly outside of the ambit of Title VII.  *See, e.g.*, *Keller v. Crown Cork & Seal USA, Inc.*, 491 F. App'x 908, 914 (10th Cir. 2012) ("Keller generally complains about strict application of policies, increased supervision, write-ups, means and methods of communication with her supervisors, and restrictions on her employment relationships.  As the district court concluded, these issues are in the nature of ordinary workplace tribulations; they do not rise to materially adverse actions sufficient to support a claim of retaliation.").  As Plaintiff's alleged retaliation is not "materially adverse" for the purposes of Title VII, the Governmental Defendants are entitled to judgment as a matter of law.

## CONCLUSION

The undisputed facts before the Court make patent that Arthur cannot recover under Title VII either for a claim of racial discrimination or retaliation.  Consequently, Defendants are entitled to judgment as a matter of law.  As these are the only remaining claims in this action, the Court will enter judgment accordingly.

**IT IS THEREFORE ORDERED** Defendant Bloomfield School District and Defendant Bloomfield School District Board of Education's Motion and Memorandum for Summary Judgment [Doc. 101] and Defendant Rob Ford's Motion and Memorandum in Support of Summary Judgment [Doc. 102] are both **GRANTED.**

Dated this 17th day of June, 2015.

_____
**MARTHA VAZQUEZ**
UNITED STATES DISTRICT JUDGE

13